Morning your honors, I'm Chris Welsh with the San Diego County Office of County Counsel. I'm here this morning representing a social worker Maya Bryson and her supervising social worker Cheryl Berglund. What we're addressing here today would be first the exigency in the removal of the two-year-old son of the Reynolds family and the next issue of qualified immunity. When we look at exigency under the circumstances of this case we're looking at a social worker making two decisions. She's using judgment. Is there reasonable cause to believe that a child is in imminent danger of serious bodily harm? That's the first part. Next she's making a calculation. Would the people posing that danger have access to harm the child during the time it would take to get a protective custody warrant? That's what Maya Bryson and Cheryl Berglund are dealing with. Next the third component would be they need to consider is there a less intrusive means than removing the child into temporary protective custody? Here the setting provides exigency because we have a six-week-old infant at the hospital, a tiny baby, and it turns out that baby has been reported by the doctor at Kaiser Hospital and the doctor concludes that their largest bone in that baby's body is broken, the femur, and there's no explanation for it. So the emergency after hours call is made and he says, I suspect as a doctor this is non-accidental trauma. So think about what that means. The biggest bone in this infant, too young to crawl or walk or even roll over, has the biggest bone in her body fractured and we have a medical doctor saying non-accidental. That's intentional child abuse that resulted in that injury. That's what he suspects. Maya Bryson, the social worker, goes out to Kaiser Hospital after hours and she doesn't leave until midnight. We have six pages of a single spaced log of her investigation notes and what does she find out? She meets with the doctor and she finds out this is an injury that takes a direct force upon the thigh bone and direct pressure in order to fracture it and break it like a wooden pencil. She finds that out. Were these bones normal? Now, of course, we later find out that there was something else going on but this is, in your view, a perfectly plausible conclusion as to how this happened. Right. It's perfectly plausible and if we get into hindsight then we're cheating the concept of exigency from the social worker's viewpoint. I understand that but I want to make sure that we understand that that's not the only way this could have happened and it turns out it happens in a different way. Right. So the social worker is relying on a medical doctor saying that he suspects it is intentional child abuse. And so the social worker does the investigation that night after hours. She stays at the hospital till about midnight. She meets with the mom separately, with the dad separately, with the doctor. She views the infant. She talks to the child abuse detective who's investigating and she gathers information until the point where there's a decision point. And the first decision they made was to place a hospital hold to protect the six week old infant so that the parents could not do any further harm to the infant. That decision has been upheld by the lower court and so what we're here today about is the next decision and that is what about the two-year-old sibling. Now do we have exigency for the two-year-old sibling and so what is the investigation showing about the two-year-old? Well we have only three people who had contact with the infant that day when the fracture reportedly occurred. The mother, the father, and the grandfather. So those three people cannot be ruled out as potential abusers. I thought it was the grandmother. You just said grandfather. Am I mistaken? If I said grandfather I meant grandmother. Thank you. And so we have the fact that there's no explanation for how this happened but we know there's a small group, three people who are the suspected abusers. And then we have the circumstance where what is their explanation? They say well as a family we have no sleep. We stayed up until 4 in the morning. The mom's been stressed. None of this has gotten better since that morning when the infant was reportedly harmed. And so you're looking as a social worker at the prospect of who is with the two-year-old. The two-year-old is with the grandmother and the parents are leaving the hospital. The parents have access to that two-year-old. The grandmother has access to that two-year-old. And so we have a danger. And the two-year-old did have access to the baby. So it's possible that the two-year-old is responsible for the injury but of course it's also possible that any one of the three adults, one or more, is responsible. It might be possible that a two-year-old could be responsible because the two-year-old was there but no one's ever suggested a way that a two-year-old could have broken the thigh bone of an infant. But the social worker is looking at okay we have a decision point now. Do we let the two-year-old be subjected to unprotected access of the grandmother, the father, and the two-year-old? And then she has to think, okay, do we need to take action in the time it would take to get a protective custody warrant from the court? But in some cases... Excuse me, I had one other question too. There's a suggestion in the record that the mother of the two babies had reported that the grandmother had abused her when she was a child. With that, am I correct if that is suggested? And if so, was that something that was known at the time of this decision? Okay, in the supplemental excerpts of record at page 72, the social worker notes that night at the hospital when she interviewed the mother, the mother of the infant said that the grandmother had her when she was 15. She hopped from mother to father to grandmother to uncle. She had been abused. Her aunt was a glorified sociopath, broke and cracked her jaw, and she described her mother as an unfit parent. That's the mother's description of her mother who was the grandmother in this scenario. Okay, so that was known to the social workers at the time they made this decision? Yes, that's in her notes that night. And so, now it becomes a judgment call, will the two-year-old be in danger in the time it takes to get a protective custody warrant? And in San Diego, at midnight on a weeknight, there is no protective custody warrant available. And so, the social worker's thinking, in the hours or days it would take to get a protective custody warrant, what happens with this two-year-old? The two-year-old's going to be subjected to the three potential abusers. That's dangerous. That's exigency. And so, the child is removed. Even if you were to find a question of fact on the issue of exigency, qualified immunity would protect the social workers here because there is no consensus in the cases as of 2010 when this occurred that would establish that the social worker was breaking the law or doing something unconstitutional in making this decision to remove this two-year-old. And so, the law requires the appellees here to prove that there is a consensus of cases that clearly established at the time of this action that it was unconstitutional. And we don't find that consensus of cases. From the Wallace case and other cases, we get an overview describing what exigency is, but you don't get as required in the more current cases, the SB case, the Kirkpatrick case, you don't get down to the level of the specific facts of this case. They have not met their burden of providing similar case law with similar facts involving an infant at the hospital with a severe injury and then the decision being made about a sibling. And they don't have case law that says the mother, the father, and the grandmother, all the people with access to this two-year-old are the suspected potential abusers. And so, this is not something where the case law as of 2010 had been clearly established. And so, if you look at the argument here, they're trying to look at this from a high-up level and say, Wallace establishes you have to have exigency. If you don't have exigency, you lose. And we're saying, no, the cases now say you have to get into facts similar to those of your case, and that has to be established to the point where only an incompetent, plainly incompetent parent would go ahead with the removal of the two-year-old. And that's not the status of the law. That's not the case law, especially as of 2010. If you look at the cases on exigency, the cases that we've been talking about, each one of them has a different aspect to it than this case. In many of the cases, it would be one parent is suspected. Why remove the child from the other parent who's not even a suspected abuser? We don't have that here. In some cases, they'll say there is no risk of serious physical injury. You're worried about bottle rot or some sort of neglect that's not going to change in the time it takes to get a warrant. In other cases, they have the social worker admitting, I could have gone to get a warrant and the child would have been safe during the time it would take to get a protective custody warrant. None of those are matching the facts of this case. We have Maya Bryson and Cheryl Berglund at midnight deciding what to do, knowing that it could take hours or days to get a warrant, and knowing that the three potential abusers are in a circumstance where they're converging on this two-year-old. And we have the underlying case where the district court has affirmed that six-week-old, it was reasonable to hold that six-week-old and to treat that six-week-old as if the parents were abusive and could not have further access to the six-week-old. What's the difference now with the two-year-old? The two-year-old's very young, tender age where you're not able to protect yourself, communicate well, you're not able to defend yourself or do anything but rely on those adults. So this is the circumstance that Maya Bryson was confronted with. With that, I'll save some time to respond. Okay. Thank you. Thank you, Your Honor. Donnie Cox for the Plaintiff. May it please the Court. Your Honor. Are you going to split time? Are you going to do it all yourself? I'm going to do it all myself, Your Honor. Okay. So the argument by the defendants in this case is interesting because it does not match what happened at the night of this incident. The night of this incident, no one suspected that Ms. Holland was abusing this child. The evidence for that is that two hours after they removed H.R. from her custody, she went to the hospital unsupervised and spent the next five days there unsupervised with R.R. Now, the defendants tell you that they were required to make Mom and Dad leave because Mom and Dad were suspected of abuse and they had to keep them away from the newborn. Well, if they suspected Ms. Holland of abusing the child, why was Ms. Holland allowed to spend five days unsupervised with this child? Counsel, what that suggests is that maybe they didn't go far enough, not that they went too far. I mean, you could look at it either way. The grandmother and each parent had been alone with the injured baby during the day in question and it wasn't known if there had been abuse which one had been the abuser. And there is this history of the grandmother and the abuser. What I'm saying, Your Honor, is that at the night of this incident, the social workers did not suspect that Ms. Holland had abused R.R. or had broken her leg. There is no evidence whatsoever at the time of this incident that they considered her to be a suspect. And so for them, and what we've done here is we've kind of, this is something that they've created for the civil case. In the juvenile court case, she spent the next five days with this child and then once the child was released, she and the paternal grandmother spent the next six weeks or so taking care of this child. Nobody ever suspected that Ms. Holland was abusing this child on the day of this incident. This stuff about Heather's mother being abusive when she was young, she was 15 years old. Well, that may be, that can explain something, but it doesn't, I mean, do you disagree that that is part of what was in the notes and the interviews that the social workers have? Well, it's part of the notes, Your Honor, but it wasn't even raised in their opening brief. They didn't raise this issue until the reply brief. But our job is to look at the whole record and determine whether what happened meets the criteria. I get that, Your Honor. Unfortunately, though, what we have is we have a situation where Ms. Holland is now being castigated or casted some sort of villain in this thing when on the night of the incident, she was not considered an abusive grandparent. No, the real question is whether the social workers are villains. I mean, they can be mistaken, but if they are careful and reasonable in what they do, they're protected from liability. Well, Your Honor, all the cases in this circuit, every single one, say that you are required to do a reasonable investigation and have articulable evidence before you remove a child. And each child has to be, each one of those children have to be evaluated individually. That's what Wallace says. That's what every case in this district says. And what level of suspicion of danger is required to justify the social workers doing what they did? I mean, they don't have to be certain. No. This is a judgment call. So what level of suspicion do they have to have? They have to have the suspicion that that individual child is in imminent danger of serious bodily injury. Right. So under these circumstances, Ms. Holland has the 2-year-old. Social worker comes to the house and literally rips this baby out of her arms screaming, doesn't ask her any questions, doesn't ask her anything about R.R., by the way. Doesn't say, do you know how R.R. was injured? Do you have any explanation for what happened here? Do you, you know, were you in the room? How long were you there? Doesn't say, can I talk to H.R.? They've said in their papers that he was a 2-year-old. Well, he was actually 2-1⁄2. And anybody who has been around a 2-1⁄2-year-old knows not only are they verbal, you can't keep them quiet. Well, I've had lots of 2-1⁄2-year-olds. My own children, my grandchildren, I know 2-1⁄2-year-olds. Yeah, they're verbal. When they choose to be, they are sometimes unreliable witnesses, shall we say? Sure, but they could have at least asked H.R., you know, asked him questions. They could have asked to see him. They could have asked to look at him. They could have asked to sit down with Ms. Holland and chat with her about this. They didn't do that. They were required to do a complete investigation in this district. Well, it's possible, of course, that had H.R. been left with the grandmother, that the parents could have come over and picked him up. Well, Your Honor, the parents have said that they intended to spend the night at the hospital. It was the county that forced them to leave. That was completely against the policies and practices of the county. And in addition to that, that was easily resolved. All the social worker had to do was say, may we leave your son with Ms. Holland, and will you agree not to go see him or be around him unsupervised until we can complete our investigation? The law is very clear. It's not just clear on constitutional law, but under the policies of the county and the state of California's laws, which track Wallace, I might add, they have to evaluate each child individually and determine whether or not that particular caretaker is a risk to that child. They didn't do that here. There was absolutely no evaluation done for H.R. Zero. And, you know, the doctor who did this evaluation was an emergency room physician. He was a pediatrician. But he said, and he said both in his statement and he reaffirmed it in his deposition, I didn't know what happened to this child. I wasn't sure. So, you know, all you had to do was leave H.R. with the grandmother until this thing was resolved and say, mom and dad, please do not, please do not have unsupervised visits with me. You know, I end up very sympathetic with the parents and the grandparents and to a degree, of course, with the children. R.R. is too small to have any sense of what happened. H.R. will grow up without a memory of it, but who knows what gets imprinted. I'm very sympathetic. On the other hand, the defendants in this case are charged with protecting the children and there's a lot they don't know. What they do know gives them some reason to suspect that the father or the mother or even possibly the grandmother was responsible. And if something bad had happened at the grandmother's house, those social workers would have been blamed. Well, Your Honor, I'm not saying that they shouldn't have gone to the grandmother's house and interviewed her, investigated, evaluated, but they didn't do that. They made the decision to remove this child before they had done any of that. They didn't go to the house with the intention of doing a further investigation. They went to the house with the intention of removing the child. And again, they are required to do an individualized investigation for each child. That's what the law requires. And, you know, at the very least in this case, at the very least, this court should affirm that social workers have an obligation to do an individualized evaluation. Because one of three things happened here. Either the social worker completely disregarded county policy and state law and the Constitution and went and picked these kids up, picked this child up without doing a full evaluation or she completely disregarded the policies of her own county which again track laws that say when you put a hospital hold on a child, you have to evaluate the other child to make a determination whether that child is in danger. Or three, the county's policies and practices with regard to training on that issue are deficient. In any event, there's a question of fact. So in the plaintiff's position here is that the law was clear, but at the very, very least it needs to be reaffirmed that social workers need to do a complete and full investigation, a reasonable investigation, before they remove a child. It seems to me that our mandate here today is actually quite narrow, that we have to assume the facts as you would like them assumed and take those facts and determine whether or not there's any law that was clearly established at the time that even under your version of the facts they're entitled to qualified immunity. Would you agree that's the inquiry today? I would, Your Honor. With the exception that the county has continued to ask for some sort of a statement from the court that what the social workers did was reasonable. And our position is what they did was not reasonable. Well, we don't have a full factual record yet on that. Isn't that correct? That is correct, Your Honor. As I see it, and my colleagues maybe at conference will tell me I got this wrong or maybe not even now, is that we take, because this is a very narrow interlocutory appeal an exception to the usual rules about appeals, that they're trying to appeal the denial of summary judgment. And so we take your version of the facts and we say, okay, based on that version of the facts, was it clearly established back in 2010? And that's really what I mean, I understand that the reason I ask is the appeal right now is somewhat being argued like a really summary judgment was granted and we're trying to argue but that's not really what we're doing here today. Well, the Susie A test allows for you to make a determination, one, whether or not the whether the removal and detention was reasonable under the circumstances and then go to the second prong and say, even if it was unreasonable, what they did was unreasonable, we find that social workers have qualified immunity. No, and I agree, and I think if it were if summary judgment had been granted in favor of the city, I think we would have a much broader mandate, but here the summary judgment was denied. So the bandwidth that the other side has to argue is actually much narrower than in the typical situation where summary judgment were granted. That's fine, your honor. Thank you. Thank you. The excerpts of record at page 124 contains the declaration of Maya Bryson, the social worker, and she says that night, given the facts reported to me by the parents, we could not rule out the mother, the father, or the grandmother as possible perpetrators because all three had been present during the time frame when the fracture apparently occurred. And so there is evidence before the court undisputed that the thought process of the social workers was to consider the grandmother and the group of potential abusers. The declaration this is paragraph 7 of Maya Bryson's declaration, she says we discussed HR's decision to take Maya Bryson to the hospital instead of automatically taking him into protective custody once a hospital hold was placed on his sister. That's the appropriate process. That's what was done here in light of the investigation. The evidence about the grandmother returning to the hospital some hours later, that's not known to Maya Bryson at the time she's making this decision. That's an example of hindsight. If you look at what's required of an investigation that night, there's nothing that requires them to go talk to the two-year-old. The Wallace case says there should be a reasonable investigation under the circumstances in light of the injury and the context and the timing involved. And here it's midnight, you have a severe injury to the infant and the timing involved is the two-year-old's with the grandmother right now and the parents are on their way. And so we cannot get a protective custody warrant. The social worker is looking at this confluence of circumstances and having to make a judgment call. She calls her supervisor who helps and makes that decision. This is not a situation where it's we need to go investigate because it's a 15-year-old and maybe the 15-year-old can defend him or herself or has a story that adds to what the investigation, what the parents told us. This is a two-year-old who's home and the investigation that Wallace and the other cases require doesn't extend to let's go talk to the two-year-old. There already has been an investigation regarding the grandmother and her own daughter says she's an unfit parent. The talk to the two-year-old I don't know how realistic it is to expect you're going to get a useful narrative out of a two-and-a-half-year-old child waked up at midnight to tell you what happened. At least that's in a reasonable range for a social worker to agree with the statement you just made. Finally, on the bandwidth of the facts that we have, we're looking at the social worker's investigation that night and the facts, the main facts are coming from the doctor which are undisputed and from the investigation at the hospital. We're using their own statements and their own facts. We're not getting into outside facts that aren't in front of the court. The social worker had the facts that night from the parents and from the doctor, from the investigation at the hospital that justify exigency and that would set the factual setting for this court to now look have they met their burden of showing a consensus of clearly established case law and if they have not these social workers are entitled to qualified immunity. Did you want to say anything about the recent case, I think it's called Keats versus Coyle? Sure. The Keats case, I believe I received yesterday. It just came out. That's on a motion to dismiss and so they're accepting everything in the complaint as true. There's nothing in the complaint that provides defenses for the social workers, but that case, this court is careful to um this it says this sheds little light on qualified immunity if that issue were to be raised at the motion for summary judgment stage. That's where we are here. That case doesn't do anything to prevent our argument here. Thank you. Thank both sides for helpful arguments. The case of Reynolds versus Bryson and Berglund submitted for decision.
judges: Graber, W. Fletcher, Owens